UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAY 0 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

Plaintiff,

v.

NATBEYE E. KOUMBAIRIA,

Defendant.

Criminal No. 07-0061 (JDB)

## ORDER OF REVOCATION AND DETENTION

The United States moved on April 26, 2007 to revoke the order releasing defendant Natbeye Koumbairia pending trial. A revocation hearing pursuant to 18 U.S.C. § 3148 was held on May 1, 2007, at the conclusion of which the Court granted the United States's motion, revoked the order releasing defendant, and ordered that defendant be detained pending trial. This Order supplies written findings of fact and supplements the oral explanation for that decision given in open court at the May 1, 2007 hearing.

I.  **BACKGROUND**

The following facts are drawn from the record in this matter, the testimony at the hearing held on May 1, 2007, and the exhibits introduced during that hearing. Defendant was arrested on March 6, 2007 and indicted on March 15, 2007 for unlawful possession of a firearm and ammunition by a person previously convicted of a felony. See 18 U.S.C. § 922(g)(1). Magistrate Judge Facciola ordered defendant released, but placed him in the District of Columbia's High Intensity Supervision Program ("HISP"), under the supervision of the Pretrial Services Agency

("PSA"). The United States subsequently moved, both before Magistrate Judge Facciola and before this Court, to have defendant detained pending trial pursuant to 18 U.S.C. § 3142, relying principally on a risk-of-flight argument related to an independent criminal fraud investigation of defendant. After hearing testimony and argument from counsel, the Court took the motion under advisement, maintained defendant's participation in the HISP, and increased the length of defendant's curfew.

One of the conditions of defendant's release was that he refrain from any illegal drug use. Dkt. #3. Defendant tested positive for marijuana when he was initially placed in the HISP on March 13, 2007. PSA counts a test as "positive" not if any trace of marijuana ($\Delta$-9 THC) is found in a defendant's urine, but where the level exceeds fifty (50) nanograms per milliliter. Defendant again tested positive a week later, on March 20, 2007, this time with increased levels of marijuana. In a Status Report sent to the Court the next day, PSA Officer Devessdra McKoy stated that "the test was residual" - - in other words, that the result did not indicate new use by defendant. Def.'s Exh. 1 at 1. McKoy confirmed at the May 1, 2007 hearing, however, that her remarks were an "administrative oversight" and that she had not seen the report revealing the higher levels of $\Delta$-9 THC. Defendant was tested every seven days between March 13, 2007 and May 1, 2007. Although there was a general downward trend in the marijuana levels from March 20 to April 17, defendant continued to test positive, with results consistently, and often well, over PSA's threshold of 50 nanograms per milliliter. Gov't Exh. 2. This downward trend ended on April 24, when the drug test revealed an upward jump in his marijuana level. Id. For every test between March 27 and April 24, PSA toxicologists interpreted defendant's marijuana level as indicative of new use. PSA thus imposed administrative sanctions on defendant, increasing the length of his curfew and

subjecting him to extended periods of home confinement. Def.'s Exh. 1 at 3, 7.

On April 18, 2007, PSA Officer McKoy filed an official request that defendant be removed from the HISP and from PSA supervision. Her request was based on defendant's continuing positive tests for marijuana and his alleged violation of a curfew condition on April 12. Id. at 7. A hearing on the government's earlier motion to revoke defendant's pretrial release was already scheduled for April 26, 2007. But the government had not yet filed a written motion, based on the April 18th PSA request, to revoke defendant's pretrial release pursuant to 18 U.S.C. § 3148(b). At the hearing, the Court observed that the question of whether a revocation proceeding could be initiated without such a written government motion remained unresolved. Compare United States v. Roland, No. 05-mj-111, 2005 U.S. Dist. LEXIS 20527, at *12-*21 (E.D. Va. Aug. 31, 2005) (no government motion required), with United States v. Herrera, 29 F. Supp. 2d 756, 759-61 (N.D. Tex. 1998) (government motion required). Defendant's counsel also indicated that he did not have sufficient notice and an opportunity to prepare for a hearing that would include witnesses. Out of an abundance of caution, the Court declined to act on PSA's request and continued the hearing until May 1, 2007. The government promptly filed a written motion pursuant to § 3148(b).

At the May 1 hearing, the Court heard testimony from the following witnesses: Jamie Goldbergh, a biological services laboratory technician for PSA; Alan Petty, a forensic toxicologist at PSA qualified as an expert in the fields of forensic toxicology and forensic chemistry; PSA Officer Devessdra McKoy; and Dr. Deborah Norris, proffered by defendant and accepted as an expert in psychopharmacology, a field defined as the study of the effects of psychoactive drugs -- that is, drugs of abuse -- on the brain, the body, and behavior. The testimony of these witnesses and accompanying exhibits, along with the arguments from government and defense counsel,

formed the basis for the Court's conclusion that the government demonstrated by clear and convincing evidence that defendant had violated the conditions of his release and that defendant is unlikely to abide by any condition or combination of conditions of release. See 18 U.S.C. § 3148(b).

## II.   STATUTORY STANDARD

"The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq., permits the revocation of release and an order of detention for a person who has been released under 18 U.S.C. § 3142 and has violated a condition of that release." United States v. Addison, 984 F. Supp. 1, 2 (D.D.C. 1997). The Court "shall enter an order of revocation and detention" if, after a hearing, it

> (1) finds that there is—
>     (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>     (B) clear and convincing evidence that the person has violated any other condition of release; and
> (2) finds that—
>     (A) based on the factors set forth in section 3142(g) of [Title 18], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>     (B) the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b). At issue here is whether there is clear and convincing evidence that defendant Koumbairia violated a condition of his release and, if so, whether he would be unlikely to abide by any condition or combination of conditions in the future.

## III.   ANALYSIS

The condition of release at issue is the bar on defendant's use of any illegal drug. After a

careful review of the drug test results and the PSA Status Reports introduced in evidence, and after evaluating the testimony of toxicologist Alan Petty and Dr. Deborah Norris, the Court finds by clear and convincing evidence that defendant used illegal drugs while on pretrial release and, in doing so, violated the conditions of his release. First and foremost, the results of the weekly drug tests reveal that defendant tested positive for marijuana - - and was well above the threshold of 50 nanograms per milliliter - - every week from his entrance into the HISP on March 13 through April 24. Only defendant's May 1 test, which was conducted over a week after PSA requested that he be taken out of the HISP and days after the government filed the present motion, placed him below the threshold of 50. Moreover, PSA toxicologists concluded that the continued positive tests on March 27, April 3, April 10, April 17, and April 24 were the result of "new use."

PSA toxicologist Alan Petty explained the basis for PSA's conclusions at the May 1 hearing. According to Petty, PSA bases its determination that a positive result was due to new use on certain inferences that can be drawn from the half-life of marijuana - - that is, the time it takes to reduce by one-half the amount of marijuana's active ingredient, $\Delta$-9 THC, in the body. Petty testified that the half-life of marijuana is typically three days. Hence, if one weekly test places a defendant at 210 nanograms per milliliter and that defendant does not use the drug again in the intervening week, PSA toxicologists expect that the next test would produce a result below 105. Any quantity above that, Petty indicated, could be the basis for a finding of new use. Petty acknowledged on cross-examination that some in the scientific community dispute that the half-life of marijuana is properly measured as three days and that factors such as the frequency of past use, the person's body weight, level of physical activity, consumption of other drugs, and illness could affect how quickly marijuana leaves the body after a person has stopped using. At the same

time, he indicated that, if all of the factors mentioned by defendant had to be taken into account for each testing client, generalized criteria for interpreting numerical testing data could not exist. The Court finds Petty's testimony credible and convincing, and concludes that his testimony both explains and supports PSA's interpretation of defendant's results.

In reaching this conclusion, the Court accords little weight to the testimony of defense expert Deborah Norris. Dr. Norris disputed that the half-life of marijuana is typically three days, stating instead that some studies placed the number as high as twenty-seven days. The half-life, she testified, "varies widely" and turns on many of the factors listed above - - the frequency of past use, the person's activity level, weight, ingestion of other drugs, and potential illness. With respect to defendant specifically, Dr. Norris concluded that his positive tests were not necessarily indicative of new use, and were instead consistent with another theory: that defendant's frequent use of marijuana prior to placement in the HISP had left a large amount of $\Delta$-9 THC in his adipose tissue (i.e., fatty areas), and that a sudden change in one or more of the factors listed above may well have caused his body to release increased amounts of $\Delta$-9 THC from one week to the next.

An overarching problem with the defense's theory, and with Dr. Norris's testimony in particular, is that it calls into question the viability of all drug testing based on levels of $\Delta$-9 THC in a person's urine. On cross-examination, Dr. Norris admitted that there is no upward "blip" or "spike" from one week to the next, no matter how large numerically, that she would accept as sufficient to establish new use. In order to make such a determination, she said that she would need to consider some if not all of the series of factors listed above. But with respect to defendant Koumbairia, Dr. Norris knew only that his counsel said he had been a frequent user; she did not seek, and defense counsel did not provide, any other information. Dr. Norris therefore did not

-6-

have information about any of the other factors she considers relevant and could not know whether any of those factors, either alone or in combination, might have accounted for the two significant upward jumps in Koumbairia's Δ-9 THC levels on March 20 and April 24.

Three other aspects of Dr. Norris's testimony undermine both her credibility and her conclusions. First, Dr. Norris admitted that, when she has previously testified as to whether positive drug tests were due to new use or were residual (i.e., were the result of stored Δ-9 THC being excreted), she has <u>always</u> concluded that the use was residual. This tends to confirm the problem identified above - - namely, that Dr. Norris is especially unlikely to attribute increases in Δ-9 THC levels to new use. Second, Dr. Norris prepared the chart used during the May 1 hearing based on the data from the March 20 through April 17 tests, a period that conspicuously omits the higher levels found on the more recent April 24 test. That information, however, was available to the defense at least three days before Dr. Norris was hired and began her work. Although Dr. Norris testified that the April 24 results did not alter her ultimate conclusion, she admitted on cross-examination that she learned of those results only on the morning of the May 1 hearing.[1] She may thus have developed her theory and reached her preliminary conclusions based on incomplete data. Finally, Dr. Norris conceded under questioning from the Court that she has <u>never</u> before seen a situation (personally or in the reported literature) where the marijuana test level, absent new use, had not reduced by one-half within the twenty-seven day period she identified as an outer limit for marijuana's half-life. But taking the period from the initial March 13 test to April 24 - - a period of over forty days - - the reduction in defendant's level was far less than one-

---

[1] Dr. Norris simply labeled the April 24 results a "spike" perhaps caused by release of residual Δ-9 THC and not inconsistent with an overall downward trend in the test results.

half; indeed, it was less than a 30% reduction. Dr. Norris could offer no explanation for this result.[2] This Court finds that the explanation is the one that is both the most obvious and that is supported by objective data: defendant repeatedly used marijuana while on pretrial release.

Having concluded that the government has shown by clear and convincing evidence that defendant violated a condition of pretrial release, the Court must now determine whether defendant is unlikely to abide by any condition or combination of conditions of release. See 18 U.S.C. § 3148(b)(2)(B). The specific question is whether defendant is likely to abide by the requirement that he refrain from using any illegal drugs. The Court finds that he is not. Key to this finding are the repeated positive tests for marijuana and the Court's conclusion, explained above, that those positive tests in fact resulted from new use. The Court repeatedly warned defendant - - including at the two hearings on the government's motion for pretrial detention pursuant to 18 U.S.C. § 3142 - - that failure to abide by all of the conditions of his release would subject him to serious penalties. Defendant likewise had notice, via the frequent Status Reports prepared by PSA, that he had tested positive and that PSA toxicologists had attributed the results to new use. His drug use nevertheless continued for over a month. The May 1 test result, which placed defendant below the 50 nanograms per milliliter threshold for the first time, certainly demonstrates that defendant is capable of abstaining from drug use. But this change for the better came too late in the game, at a time when defendant likely realized that PSA and the Court were serious about enforcing his conditions of release and that his transgressions might well land him in

---

[2] The Court notes that the same unexplained result exists for the twenty-eight day period from March 13 to April 10. It is also noteworthy that the negative test result from May 1, more than a week after defendant was on notice of this revocation proceeding, may illustrate the type of reduction in defendant's test results that occurs when there actually is no new use.

pretrial detention. For these reasons, the Court finds that defendant is unlikely to abide by the condition of release barring him from using illegal drugs.

## IV.  CONCLUSION

Upon consideration of all of the evidence presented, and the standards set forth in 18 U.S.C. § 3148(b), the Court finds by clear and convincing evidence that defendant violated a condition of his release, and also finds that defendant is unlikely in the future to abide by any condition or combination of conditions of release. Accordingly, the order granting defendant pretrial release is revoked, and defendant is ordered detained pending trial.

/s/ John D. Bates
JOHN D. BATES
United States District Judge

Dated: May 3, 2007